Case No. 24-1028, et al. Save the Sound, Inc. Petitioner v. Federal Aviation Administration and Michael Whitaker in his capacity as Administrator of the Federal Aviation Administration. Ms. Horelic for the Petitioners, Ms. Jaffe for the Respondents. Good morning, Council. Ms. Horelic, please proceed when you're ready. Thank you, Your Honors. Good morning. May it please the Court, my name is Dana Horelic. I represent the Town of East Haven, Connecticut. I'm joined by Council for Co-Petitioner Save the Sound, and I will be presenting argument on behalf of both petitioners today. I've requested two minutes for rebuttal. These consolidated petitions challenge the FAA's fundamentally deficient NEPA review of the proposed expansion of Tweed Airport in Southern Connecticut. Tweed is a small regional airport. It is located in a FEMA-designated floodplain that mostly consists of inland and coastal wetlands and is closely surrounded by densely populated residential neighborhoods that share space in the same floodplain. In fact, the runway is so close to the neighboring residential communities that you could literally stand on it and hit a baseball into someone's backyard. The proposed action is but one piece of a massive project to expand the airport in this small community. Instead of acknowledging the interconnected nature of the comprehensive master plan from which the proposed action was born, the FAA isolated it and considered it in a vacuum. In so doing, the FAA was able to escape the unavoidable conclusion that significant environmental impacts will be experienced in this already burdened environmental justice community. The FAA's environmental assessment and its subsequent finding of no significant impact were arbitrary and capricious for four reasons which we lay out fully in our briefs. I'd like to focus today primarily on our cumulative impact analysis, but I will begin by briefly mentioning that the environmental assessment did fail to take the requisite hard look at the impacts of the proposed action on flooding, stormwater pollution, and inland and wetlands in the FEMA-designated floodplain in which the airport sits. Hardened look sounds like a favorable standard for you. Do you think it fairly states NEPA law post-Seven County? Yes. Under Seven County, the Justice Kavanaugh for the court emphasized that the agency is due deference, but it nevertheless must still provide a reasoned analysis for its decision, and a hard look provides precisely that, that the agency must provide the reasons for why it came to the conclusion it came to, and it can't simply write the ending before it writes the rest of the book. As agencies and experts in this case pointed out, for example, FAA's analysis underestimates the amount of fill required to mitigate the impacts from localized flooding. It fails to account for the impact of grading and filling wetlands, and it utterly fails to provide specific mitigation measures beyond simply referring to third-party permitting processes. It is devoid of the details and reasoned conclusions that a hard look demands and is therefore arbitrary and capricious. The FAA doubled down and compounded this error by ignoring the cumulative environmental impacts of the taxiway reconfiguration, which all parties concede will happen as a connected... Really the issue, whether it was arbitrary and capricious for the FAA to use the kind of five-year window, isn't that really what that argument comes down to? I think that's a piece of the argument, Your Honor. I think the five-year window is convenient given the phasing timeline that was set out in the master plan, and thereafter adopted by the FAA in the environmental assessment. But I think more so is the fact that the taxiway reconfiguration is and was envisioned initially in the master plan as a necessary and integral part of this entire proposed expansion. It's reasonably foreseeable and reasonably certain for a number of reasons. Necessary and integral part, those words, is that your characterization or is that the way that the agency characterized? I don't want to speak for sister counsel. She would probably disagree with that characterization. So that is our characterization, but I do believe it's accurately reflected in the master plan and quite frankly in the analyses that are lacking in the environmental assessment. It's clear that the taxiway reconfiguration will take place in the same geographic location as the runway expansion. It has the same project sponsor. The same entities will be overseeing it. It has the same funding, and the FAA has regulatory authority over both. The impacts of both projects will absolutely be felt in the same geographic area. So, I mean, I take it at some point you would or at least you wouldn't disagree that time horizons and likelihood has to factor into it in some measure, right? Yes. So, if it's a longer time horizon for when that's going to happen and there's at least some uncertainty about the exact parameters and contours, that seems like it would be germane to whether we would require the agency to consider them as a whole as a cumulative impact or whether it's fair to put one off to the side for now given the time horizon and the uncertainty. It would be germane. It is germane, Your Honor, but the record reflects in this case that this is not a hypothetical potential project that the parties or really that the town and the authority put into a bucket and set to the side to be considered. In the master plan, which envisions the entire proposed action, the taxiway reconfiguration was mapped precisely. Its precise location was mapped out, the layout specifications, the timetable for its completion, and I will note that it is a phased process, but every phase of the action includes some aspect of a taxiway reconfiguration. The airport layout plan itself also envisions the taxiway reconfiguration. This, the taxiway reconfiguration is the only proposal, the only proposal in the master plan that will bring the runway and taxiway into FAA compliance with the offset, the separation standard, the 400-foot separation standard. It's currently not compliant. There's a model. But isn't it the case that that standard may not be met, but it's not mandatory standard? It's not a mandatory standard, Your Honor. I would agree with that characterization. However, there's no doubt that it certainly plays a large role in ensuring public safety, and FAA itself in its brief has conceded that after the construction of the expanded runway is completed, it will be necessary, and FAA said it will be necessary to reassess the safety standards of the taxiway or of the runway in light of current taxiway construction to see what's next. So if the agency concedes, as it has here, that there's going to be a separate NEPA analysis if and when that taxiway reconfiguration is, they proceed with it, what's your prejudice here? The prejudice is all of the harm that flows from waiting, Your Honor. There's no doubt that there will be significant impacts, and the law requires consideration of the cumulative impacts of related and reasonably foreseeable actions by failing to consider the cumulative impact of the proposed action and also this reasonably foreseeable action. But there's a chance that the taxiway reconfiguration may not happen or it may not happen in the same scope. I mean, yes, it's planned and it's been, designs have been met, but plans change, designs change. When that happens, there will be a NEPA analysis, and to the extent that those impacts from the taxiway reconfiguration are considered, that analysis will have to consider all of the changes from this current project too, right? So at that point, there will be an evaluation of everything, right? There will at that point, Your Honor, but the damage, the harm from the initial action will already have been done. And to be blunt, the taxiway reconfiguration not happening is precisely what we're hoping to avoid. We believe that everything should be considered at the same time in order to fully assess and understand what the impact of these actions will have, the true and accurate impact of these evaluations. I want to make sure I understand what you said. You're trying to avoid, they're not the taxiway reconfiguration never happening, or just the consideration of all the facts? The consideration, Your Honor. But my point is, is that it will be considered if and when that reconsideration is actually going to move forward. And Your Honor, until then, the harm will be in the face of public safety. The harm will be to the residential neighborhoods that abut the airport, which are a protective environmental justice community. The harm will be to the wetlands, the severe flooding that already exists in current conditions in the airport. And that, as experts and agencies pointed out, will only be exacerbated by the proposed mitigation measures from FAA. The harm will be tremendous. And even if the taxiway reconfiguration doesn't happen, we'll use the magic number, another five years, the impacts of what this construction project now will have will be felt for years beyond that. So there's no doubt that the impact will be felt, and it will be exacerbated by the delay. By stepping back and considering them together, it will allow all of the agencies with an interest here, and the town, who's shouldering the burden of the land space where the new terminal will be constructed, to make a more reasoned analysis and determine truly best mitigation efforts and impacts or efforts to mitigate the impacts moving forward. Make sure my colleagues don't have additional questions at this point. We'll give you a little time for rebuttal. Thank you. We'll hear from agency counsel now, Ms. Jaffe. May it please the court, Rebecca Jaffe, appearing on behalf of the United States. With me at counsel table is Evan Baylor from the Federal Aviation Administration. The court should deny the petitions. The Supreme Court's recent decision in Sevin County guides the result here, and the court should defer to FAA's reasonable analysis. The master plan represents 20 years of potential projects at the airport. Projects change. For example, the runway extension here is 60 feet shorter than the one depicted on the master plan because the airport wanted to avoid impacts to tidal wetlands. The project at issue here involves extending the runway to accommodate existing and reasonably foreseeable aircraft operations and address operational constraints from having a short runway. There is no proposal before FAA right now to reconfigure the taxiways, and no indication that it will happen any time soon, if at all. I want to respond to the point that it's going to be unsafe if the taxiways are not extended. First of all, safety is of paramount importance to FAA. Second of all, the airport is not required to extend the taxiways simply because the runway may be extended. Instead, FAA and the airport can and will implement various operational controls to maintain safety, even without the ideal taxiway configuration, which, frankly, many airports do not have ideal taxiway configurations. The extended runway will have turnaround pavement at each end so airplanes can turn around at the end of the runway. The airport will coordinate with air so that the runway can be safely used as a taxiway. If necessary, FAA can increase visibility minimums to make sure that pilots can see if there's a plane on the runway before landing. The taxiway reconfiguration as conceived on the master plan requires relocating a portion of a city street and acquiring private properties, which the airport would only do on a willing basis. That is not happening anytime soon and certainly not within the next five years. As the Supreme Court said in Sevin County, the textually mandated focus of NEPA is the proposed action, that is, the project at hand, not other future projects that may be built as a result of or in the wake of the immediate project under consideration. The agency may draw what it reasonably concludes is a manageable line, one that encompasses the effects of the project at hand but not the effects of projects separate in time. That's what FAA did here and that's what was reasonable. I will also note that the taxiway reconfiguration, I think petitioners argue the whole point of it is just to meet the extended, the new ends of the extended runway. Can I interrupt for a second? What's the magic in five years, for views in five years? Five years, so when FAA looks at cumulative impacts, it's NEPA order directs it to look about five years in the future because FAA thinks that's a reasonable look at what is going to be likely to actually happen. FAA defines reasonably foreseeable as an action that a proponent would likely complete and that has been developed with enough specificity to provide meaningful information. That's at A760. If FAA looked, say, 20 years in the future, it could look at all the projects on the master plan but it would be so speculative. Are these properties going to get acquired? Might they not shift the taxiway somewhat over here? Is the taxiway going to happen at all? And there are other projects on the master plan that the airport has the idea of expanding the fuel farm, expanding various parking lots, but those parking lots might conflict with wetlands that are on the airport property. It seems like you could have the, you're taking what somebody defines as a project as a given and I'm not sure there's anything talismanic about what somebody happens to call a project because you could definitely have a 20-year project. It would still be one project. It's of course true that even if it lasts for 20 years, the things that are on in the future, contingencies could arise, things could change. That would be true. But I'm not saying this necessarily means that what the agency did is arbitrary, but it also doesn't seem like, you know, five years is some magic figure then beyond which anything becomes totally up for grabs because you absolutely have projects that are longer in term than that and I if it's all part of one project, even if there's aspects of a project that might or might not change going forward, all of that would be considered holistically together as one whole for purposes of NEPA analysis. So I have a couple of responses to that, Your Honor. First of all, I don't think FAA took the airport's definition of what a project is as a given. And it's all analysis here. FAA didn't just look at the runway. It also looked at, what cuts are we going to do to compensate for filling other parts of the airport area? What stormwater management is going to happen with the changes, the increased impervious surfaces on the airport property? So it didn't just say, okay, we're just going to look at extending pavement on the ends of the runway. It said, what are all the things that are going to come along with this? And does this project in and of itself have independent utility, which FAA said it does because they want to address operational constraints from having such a short runway. Seven County talks about the agency can draw reasonable lines. And here, if this is not a situation where FAA said, well, we think it'll take five years for them to build the first half of the runway extension, so we won't look at the second half. What FAA said is, we think that we have one project in front of us that is concretely proposed, and we're going to look at that. We don't know that these other things the airport wants to do can and ever will happen. If, for example, this was a project to build an entirely new airport, which this is not, but just hypothetically speaking, FAA might say, okay, we think the construction of this entirely new airport might take seven years. FAA wouldn't say, okay, we don't have to look at years six and seven and everything that'll happen there. The point is here, what's a reasonable line for the agency to draw based on the proposal that's in front of it? And the master plan contains so many things that the airport would like to do, but the aviation environment is dynamic. Five years ago, Avelo Airlines was not operating at this airport at all. American Airlines was, with a different type of schedule. Then American Airlines left, and then Avelo came. So I think FAA also has to be reasonable about what is going to reasonably inform our decision-making here and enable us to consider the action that is in front of us. As the Supreme Court said in Sevin County, the goal is to inform decision-making, not to paralyze it. Isn't the, may not have this right, but I thought I saw something in the record that said that the taxaway reconfiguration was really more like in the six to nine year range out. Did I, am I misremembering? And if that's the case, then I guess to follow up on the last question, isn't that foreseeable enough or close enough that like, again, what's the magic in five years as opposed to six to nine years? But I may, correct me if I've got that factual premise wrong. So a couple of points to that, Your Honor. First of all, I'm not sure about the six to nine year range. I will note that I think a lot of the timelines that the airport had in its master plan have already been shifted back. For example, in the master plan, the airport thought that the runway would be extended and done by 2026. And I think that's, that's, it's, the project's gotten pushed back. So, so that first, also the taxiway reconfiguration, I think petitioners are framing it as one project that encompasses all of the taxiways, but there are different pieces to the taxiways and independent utility at addressing certain issues. So FAA always wants things to be more efficient. And the taxiways at this airport, which just taking a step back was built in 1929, long before we had planes of the size that we have now, long before we had the aviation standards that we have now. So the taxiways at this airport have non-standard geometry. They come up to the runway at acute angles, which is less efficient because then the pilots are kind of turning back in a funny way to look the one way. So the airport has reconfigured part of taxiway A already to address the non-standard geometry at one intersection that FAA calls a high energy intersection, which just means lots happens there. So, so there's independent utility just in fixing the geometry at that intersection. So, and the other thing about the, the taxiways at this airport is that ideally FAA wants FAA standards say that you want a 400 foot separation between the middle of the runway and the middle of the taxiway so that you can have planes of a certain size on the runway and the taxiway at the same time. This airport doesn't have that. So the taxiway reconfiguration, FAA would see utility in just moving a piece of the taxiway further away. And, and, and so I understand they've already done taxiway A. There's a map at A1145 that sort of shows the, the different phases of the taxiway reconfiguration and the time when when the airport envisions doing it. Although again, all of these timeframes have gotten pushed back, but so on this map, the in purple is phase three pavement. So that's the furthest away and that's the, the, the portions of the taxiway that would go all the way to the end of the new extended runway. Phase three is on, that's 10 to 15. That's on in the future, right? That's, so I thought a meaningful portion of the taxiway reconfiguration project was projected to be in phase three. Yes, very much of it. On the map there's, so there's some taxiway that is neither purple nor orange. That part, that small part was already done. It's just gray on A1145 and that's because the airport already did it and they, they fixed, there was non-standard geometry at the intersection with the runway, which is less efficient. So the airport already did that. There's the phase two is the orange taxiway and that would have utility again because it would fix your non-standard geometry. It would give you more separation. So there are a lot of different components to this taxiway reconfiguration. I think what is likely is that they're going to do the orange some years in the future. They may never do the purple because again, to do parts of the purple, they have to buy properties from private property owners. They have to extend the airport boundary. They have to move a city street. All of that is, is very contingent. And in the meantime, FAA obviously cares very much about safety. That is of paramount importance. And so FAA will say, put, work with the airport and say, okay, what procedures are we going to have to make sure that we can have airplanes taxiing on the runway safely and nobody else getting on the runway at the same time? My colleagues don't have additional questions at this time. Thank you, counsel. Thank you. The court should deny the petitions. Ms. Horelick, we'll give you the two minutes you asked for. Thank you, your honor. I think if we can take one theme from sister counsel's argument today, it's that, and really from the FAA itself, is that the FAA here prefers to defer to others in the future to see what will happen. Here, she suggested that they will talk to air traffic control once the expansion is done to talk about how and whether it's safe to back taxi the airplanes. This expansion is going to be, right now, the taxiway goes to the end of the runways. The expansion will extend the runway, but leave the taxiways where they are, which means you're going to have lengths of runway with no accompanying or connected taxiway. So the importance of public safety considerations when thinking about how an airplane that's much larger is going to have to safely turn around and make its way up and down the only runway at this airport, it is troubling. The taxiway reconfiguration itself is a concrete proposal. It is listed in the environmental assessment as a future action. The FAA admits that there is a risk for potential runway incursions as the airport sits right now with the runway. The reconfiguration plans are there to help mitigate that risk. The fact that we're standing here today talking about all of these details demonstrates that it's not some hypothetical plan that has been imagined and might happen. It has been thoroughly and comprehensively thought out, and it has been considered a future proposal for this project. FAA did mention the entry of a velo here into the airport, but curiously, its environmental assessment does nothing more than mention it. It doesn't consider the fact that between 2021 and 2022, the number of employments grew by hundreds of thousands. It did not consider that impact, the impact of that past event as a cumulative impact. And lastly, I'll mention that there is a different standard the court should be aware of for segmentation, which considers independent utility and cumulative impacts, which does not. If there are no further questions, we'd ask that you grant the petitions for review. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Wilkins; Katsas